**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| MARION COSTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2018-0440-KSJM |
| | ) | CONSOLIDATED |
| UIP COMPANIES, INC., STEVEN | ) | |
| SCHWAT, and SCHWAT REALTY | ) | |
| LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Date Submitted: November 8, 2021
Date Decided: May 2, 2022

Max B. Walton, Kyle Evans Gay, CONNOLLY GALLAGHER LLP, Newark, Delaware; Michael K. Ross, Thomas Shakow, Serine Consolino, AEGIS LAW GROUP LLP, Washington, D.C.; *Counsel for Plaintiff Marion Coster*.

Stephen B. Brauerman, Elizabeth A. Powers, BAYARD, P.A., Wilmington, Delaware; Deborah B. Baum, PILLSBURY WINTHROP SHAW PITTMAN LLP, Washington, D.C.; *Counsel for Defendants Steven Schwat, Schwat Realty, LLC, Peter Bonnell, Bonnell Realty, LLC, and Stephen Cox*.

Neal C. Belgam, Kelly A. Green, Jason Z. Miller, SMITH KATZENSTEIN & JENKINS LLP, Wilmington, Delaware, *Counsel for Defendant UIP Companies, Inc.*

**McCORMICK, C.**

This case involves a dispute over the control and ownership of Defendant UIP Companies, Inc. ("UIP" or the "Company").[1] Prior to the events that led to this litigation, UIP's common stock was owned equally by Plaintiff Marion Coster and Defendant Steven Schwat. After unsuccessfully agitating for a buyout of her interest, Coster called two special meetings of stockholders to elect directors to fill vacant board seats. Coster and Schwat deadlocked at those meetings, and Coster filed suit in this court seeking the appointment of a custodian to break the deadlock. In response, Schwat caused UIP to sell a third of UIP's outstanding but unissued voting equity to Defendant Peter Bonnell, a UIP executive to whom equity had long been promised (the "Stock Sale"). Coster then brought claims to invalidate the Stock Sale. In a post-trial decision, the court held that the Stock Sale satisfied the entire fairness standard. Having found that the Stock Sale satisfied Delaware's most rigorous standard of review, the court entered judgment in favor of the defendants and declined to reach Coster's alternative arguments under intermediate standards of review.

On appeal, the Delaware Supreme Court adopted this court's post-trial factual findings but concluded that the court committed a category error by evaluating the Stock Sale under the entire fairness standard only. The high court stated that this court should have also evaluated the Stock Sale under *Schnell*[2] or *Blasius*,[3] depending on whether the UIP

---

[1] *See Coster v. UIP Cos., Inc.*, 2020 WL 429906 (Del. Ch. Jan. 28, 2020) [the "Post-Trial Decision"], *rev'd*, 255 A.3d 952 (Del. 2021) [the "Appellate Decision"].

[2] *Schnell v. Chris-Craft Indus., Inc.*, 285 A.2d 437 (Del. 1971).

[3] *Blasius Indus., Inc. v. Atlas Corp.*, 564 A.2d 651 (Del. Ch. 1988).

board's motives were impure or pure.[4]  The high court thus reversed the Post-Trial Decision

and remanded the action for further consideration.

The Appellate Decision articulated this court's remit on remand as follows:

> If the board approved the Stock Sale for inequitable reasons, the Court of Chancery should have cancelled the Stock Sale.  And if the board, acting in good faith, approved the Stock Sale for the "primary purpose of thwarting" Coster's vote to elect directors or reduce her leverage as an equal stockholder, it must "demonstrat[e] a compelling justification for such action" to withstand judicial scrutiny.

> After remand, if the court decides that the board acted for inequitable purposes or in good faith but for the primary purpose of disenfranchisement without a compelling justification, it should cancel the Stock Sale and decide whether a custodian should be appointed for UIP.[5]

Toward the end of the Appellate Decision, the justices elaborated on how the above

analysis might resolve.  The court stated that

> Coster alleged that an interested board approved the Stock Sale intending to interfere with her voting rights as a 50% stockholder and to entrench themselves in office by thwarting the Custodian Action.  If that is the case, under *Schnell*, the court need not go any further to find a breach of fiduciary duty.[6]

The high court then identified factual findings that, in its view, supported a determination

that UIP's board acted for inequitable purposes under *Schnell*.[7]  To quote the Appellate

Decision:

---

[4] Appellate Decision at 953–54.

[5] *Id.* (footnotes omitted).

[6] *Id.* at 963.

[7] *Id.*

2

On appeal we believe the following undisputed . . . facts found by the court support the conclusion, under *Schnell*, that the UIP board approved the Stock Sale for inequitable reasons:

- The Stock Sale occurred while buyout negotiations stalled between UIP's two equal stockholders;

- The stockholders could not elect a new board because of the deadlock, which led to the Custodian Action;

- A majority of the board members approving the sale were interested in the Stock Sale;

- Schwat and Bonnell were friends and "from the inception of Wout's transition planning negotiation, Schwat and Bonnell appeared to be aligned in negotiations against Wout;"

- Schwat and Bonnell "worked together to develop the plan to moot the Custodian Action and neutralize the threat of [Coster] controlling the Company;"

- The defendants were "in a rush for the [McLean] [V]aluation" until the defendants "determined to answer the [plaintiff's] complaint and then subsequently amend the answer after the sale of stock to Bonnell was completed[,]" which permitted them to "file[ ] an amended answer, which stated an intention to move for judgment on the pleadings because the Custodian Action had been mooted by the Stock Sale;"

- The Stock Sale put UIP stock in the hands of fellow board member Bonnell, who was aligned with the holdover board;

- The Stock Sale entrenched the existing board in control of UIP; and

- "Defendants obviously desired to eliminate Plaintiff's ability to block stockholder action, including the election of directors, and the leverage that accompanied those rights."[8]

---

[8] *Id.* at 963–64 (footnotes and citations omitted).

3

It is tempting to end this opinion here, allowing the work of the Appellate Decision to supply the analysis, and concluding based on the above bullet points that the Stock Sale was approved for inequitable purposes and thus invalid under *Schnell*.

But the bullet points do not capture the full picture. As the Appellate Decision went on to acknowledge, the Post-Trial Decision "made other findings inconsistent with this conclusion."[9] The Appellate Decision further gave this court the opportunity to "review all of its factual findings in any manner it sees fit in light of its new focus on a *Schnell/Blasius* review."[10] This decision takes that opportunity, beginning with a review of the court's factual findings, and then turning to the "*Schnell/Blasius*" analysis.

## I. FACTUAL FINDINGS

This decision does not repeat all the factual findings of the Post-Trial Decision, on which the Appellate Decision relied.[11] Those findings are now the law of the case.[12] What follows are the facts that, on further review, bear on the UIP board's purposes and motivations for approving the Stock Sale.

The Post-Trial Decision identified multiple purposes and motivations for the Stock Sale. As the high court observed, the Post-Trial Decision found that the UIP board desired

---

[9] *Id.* at 964.

[10] *Id.*

[11] *See id.* at 954. This decision cites to: C.A. No. 2018-0440-KSJM docket entries (by docket "Dkt." number); trial exhibits (by "JX" number); and the trial transcript (Dkt. 123–24) ("Trial Tr.").

[12] *See Cede & Co. v. Technicolor, Inc.*, 884 A.2d 26, 38 (Del. 2005) ("It is well-settled that when an appellate court remands for further proceedings, the trial court must proceed in accordance with the appellate court's mandate as well as the law of the case established on appeal." (footnote omitted)).

4

to eliminate Plaintiff's ability to block stockholder action.[13]  Plaintiff had wielded those rights to create leverage in buyout negotiations.

The Post-Trial Decision found that "as much as anything, the Stock Sale was motivated by [Schwat and Cox's] desire to keep their promise to Bonnell" and that "Bonnell was viewed as essential to the Company's survival."[14]

The Post-Trial Decision further found that "the Stock Sale was significantly motivated by a desire to moot the Custodian Action," because the appointment of a custodian "was deleterious to UIP for reasons unrelated to Plaintiff."[15]  Specifically, the appointment of a custodian would have "constituted an event of default under various SPE contracts" and therefore "threatened to cut off a substantial amount of UIP's revenue streams, justifying Defendants' efforts to moot the Custodian Action."[16]

Beyond these prior factual findings, there is more to the story.  Recall that the precipitating event to this litigation was the death of Plaintiff's husband.[17]  Given the delicate emotional setting for the parties' dispute, the Post-Trial Decision elided some aspects of Plaintiff's conduct.  That drafting decision resulted in an opinion that presented the high court with a somewhat incomplete narrative when evaluating the case on appeal.

---

[13] Post-Trial Decision at *12.

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *Id.* at *5.

5

To dramatically understate matters, Wout's passing was hard on many people in many ways. At UIP, Wout was one of two rain makers and a driving force in the business. He was a mentor and a friend to many of the witnesses, several of whom expressed their fondness for him during trial.[18] He worked hard to build UIP and continued working hard until his death.[19] Of course, no one was more affected than Plaintiff. Beyond her enormous grief, Wout's death left her in a financially precarious position. She faced the threat of losing the material comforts of a life that she and her beloved husband had built together.

The sad reality is that Plaintiff's husband made her promises of future income, including immediate income upon his death, but he died before he could finalize a plan to deliver on those promises. Plaintiff would receive the benefits of her husband's share of the real estate investments that UIP managed, and Schwat estimated that those investments would generate approximately $12 million in payments to Plaintiff over time.[20] But Plaintiff would receive those funds over the ensuing years.[21] And Plaintiff wanted liquidity sooner. For this reason, Plaintiff wanted Defendants to buy out her interest in UIP. She

---

[18] *See, e.g.*, Trial Tr. at 437:20–24 (Bonnell) ("[H]e was more of a father to me in many ways than my own father. So [his death] was very . . . distressing. I . . . hung up the phone and I fell to the floor on my knees. I was very upset. And I pulled myself together and went to work"); *id.* at 14:22–15:4 (Pace) ("I remember Mr. Schwat gave what I recall to be a very nice eulogy for Wout Coster. . . . [T]he message I received from the eulogy was that Mr. Schwat had strong feelings for Mr. . . . . Wout Coster.").

[19] Post-Trial Decision at *5.

[20] JX-217 at 3 ("As you know, over the next 8 – 10 years, we expect those interests to pay you something like $12 Million.").

[21] *Id.*

6

demanded a buy-out roughly equal to thirty times the Company's total equity value as found in the Post-Trial Decision.[22]

The problem for Plaintiff is that she had no right to a buyout. The founders contemplated an owner-operated business that served to minimize risks associated with real estate investments made through special purpose entities ("SPEs").[23] They did not include buyout rights in any formative agreements. Indeed, when UIP co-founder Cornelius Bruggen resigned from UIP in 2011, he tendered his shares back to UIP for no consideration.[24]

Although no agreement entitled Plaintiff to a buyout, Defendants desired to provide for their late colleague's widow.[25] They offered a generous buyout price when compared to the value of the Company as found in the Post-Trial Decision.[26] They also offered multiple compromise positions.[27] Plaintiff declined these offers. Ultimately, Defendants declined to sacrifice the health of the Company and, indirectly, their own financial position to deliver a buyout at a size that Plaintiff would find acceptable.

---

[22] *See* Post-Trial Decision at *22, *26 (finding the Company's total equity value to be $123,869); *id.* at *7 (stating that Plaintiff would be willing to sell her UIP interests at 50% of the valuation price arrived at by Scott Valuation, LLC (citing JX-227)); JX-225 (finding valuation of $7,362,000 via Scott Valuation, LLC).

[23] Post-Trial Decision at *2.

[24] *Id.*

[25] *See id.* at *7 ("Bonnell offered to buy out Plaintiff's interests in UIP while Plaintiff would retain her interests in the promotes." (citation omitted)); JX-221 at MC0008261–62 (proposing three offers to Coster).

[26] *Compare* JX-221 at MC0008261–62, *with* Post-Trial Decision at *22, *26.

[27] *See, e.g.*, Post-Trial Decision at *7; *see also* JX-221 at MC0008261–62.

7

It was only after Defendants refused Plaintiff's buyout demand that she decided to explore her legal options, including exercising her rights as a UIP stockholder. In a candid moment, when Plaintiff was evaluating her legal options, Plaintiff's friend Anne Pace asked Plaintiff's attorney whether Plaintiff could seek to dissolve the Company. She then stated

> While this might not be in the long-term best interests of the company, frankly, Marion doesn't care about the long-term best interests of the company. She cares about having to pay her monthly bills, expenses that are already forcing her to sell the house she and [Wout] built. She cares about receiving the benefits promised her by her husband.[28]

Plaintiff's initial legal play was to demand books and records.[29] The next year, she called for a special meeting of UIP stockholders to elect directors.[30] After Plaintiff and Schwat deadlocked, she called for another special meeting.[31] Plaintiff and Schwat again deadlocked. Schwat was concerned that Coster's board nominees lacked any relevant experience. Following the second meeting, Schwat remained willing to negotiate with Plaintiff over the board's composition. He testified that if Plaintiff nominated someone with experience, he would have voted his stock in favor of that candidate.[32]

---

[28] JX-331 at MC0069535 (5/1/2016 email).

[29] Post-Trial Decision at *7; JX-45.

[30] Post-Trial Decision at *8.

[31] *Id.* at *9.

[32] Trial Tr. at 356:2–357:3 (Schwat).

8

Without making any meaningful effort to negotiate board composition, Plaintiff filed a complaint in this Court seeking the appointment of a custodian pursuant to 8 *Del. C.* § 226(a)(1) (the "Custodian Action").[33]

Until Plaintiff filed the Custodian Action, the UIP board had engaged with her. As discussed above and in the Post-Trial Decision, Plaintiff's request for custodial relief was extremely broad. Plaintiff did not present a tailored request for relief that targeted the stockholder deadlock. Rather, she asked the court to empower a custodian to "exercise full authority and control over the Company, its operations, and management."[34] The threat of a court-appointed custodian so broadly empowered posed new risks to the Company. The appointment of a custodian with these powers would have given rise to broad termination rights in SPE contracts and threatened UIP's revenue stream, as UIP's business model is dependent on the continued viability of those contracts.[35]

---

[33] Post-Trial Decision at *10.

[34] *Id.*at *16. On remand, Plaintiff narrowed her request for relief, stating: "Plaintiff seeks appointment of a custodian with *narrowly-prescribed powers*: to serve only as a neutral tiebreaker in the election of a new board and other shareholder deadlocks. *Plaintiff thus no longer seeks appointment of a custodian with the broad power* to 'exercise full authority and control over the Company, its operations, and management.'" Dkt. 166 ("Pl.'s Post-Remand Opening Br.") at 8 (emphasis in original) (quoting Post-Trial Decision at *10 n.165). Plaintiff's belated request to narrow the requested relief does not eliminate the business risks posed by the Custodian Action at the time the UIP board approved the Stock Sale. Those risks inform the court's below finding that the UIP board acted for the primary purpose of mooting the Custodian Action when approving the Stock Sale.

[35] Post-Trial Decision at *12 n.190 (citing Trial Tr. at 358:2–5 (Schwat testifying that "if somebody were to appoint a custodian to come in and manage the company in place of Pete and I, our [equity] partners would likely terminate the agreements they have with [UIP]"); *id.* at 457:10–19 (Bonnell testifying that "the primary investor . . . has broad authority to terminate . . . those agreements")). Defendants' expert Zell testified that such

Facing this threat to the Company, UIP's board thus identified a solution that the Post-Trial Decision found was entirely fair. They would issue the equity that they had long promised to Bonnell. By doing so, they would implement the succession plan that Wout and Schwat developed on a clear day before any deadlock loomed, and where the only aspects of the plan left unaddressed when Wout died were the terms of the sale to Bonnell.[36] At the same time, they would moot the Custodian Action and eliminate the risks that the appointment of a custodian posed to UIP. They would also eliminate the stockholder leverage that Plaintiff was using to try to force a buyout at a price detrimental to the Company.

The UIP board's desire to reward and retain an essential employee, implement an agreed-upon succession plan, and avoid value-destructive litigation were not, in the words of *Blasius*, "pretexts for entrenchment for selfish reasons."[37] Nor were they, in the words of Plaintiff, "post-hoc justifications."[38] At trial, Defendants proved that these were genuine

_____

termination provisions are typical within the real estate industry. Trial Tr. at 496:20–497:19 (Zell).

[36] Trial Tr. at 134:17–24 (Coster) ("Q: Did there come a point in time when Mr. Coster told you that Peter Bonnell was trying to purchase his shares of the company? A: Yes, but . . . Q: And what did he tell you about that? A: He said he wanted Peter to be part, part owner, and -- yes, that was eventually his objective, yes."); *id.* at 135:23–136:2 (Coster) (testifying that she believed that, two weeks before Wout passed, he "wanted [the sale to Bonnell] to happen," but disagreed on the financial terms proposed at the time ("he wanted to be paid for it")). Bonnell enjoyed a particularly close relationship with Wout, who mentored Bonnell and groomed him to take his position in the Company. *See* Post-Trial Decision at *2 (finding that "[o]ver the years, Bonnell grew under the mentorship of the principals, in particular Wout" (citation omitted)); *see also* Trial Tr. at 417:6–420:5 (Bonnell).

[37] *Blasius*, 564 A.2d at 658.

[38] Pl.'s Post-Remand Opening Br. at 2.

10

motivations for their actions that stood alongside the more problematic purposes that the Post-Trial Decision identified and the Appellate Decision collected.

## II. LEGAL ANALYSIS

Having painted a fuller factual background, this decision returns to the *Schnell-* and *Blasius*-inspired questions presented by the Appellate Decision. Did the UIP board approve the Stock Sale for "inequitable purposes" under *Schnell*?[39] Or, did the UIP board, "acting in good faith," approve the Stock Sale for the "primary purpose of thwarting Coster's vote to elect directors or reduce her leverage as an equal stockholder" and without a "compelling justification" under *Blasius*?[40]

### A. *Schnell*

In *Schnell*, the incumbent directors caused the defendant corporation to change the date and location of an annual stockholders' meeting by more than a month. Dissident stockholders engaged in a proxy contest sued to enjoin the change in the date and location. The trial court denied the stockholders' motion for a preliminary injunction, observing that the DGCL and the company's bylaws permitted the board to set the time and place of the meeting, and that "principles of corporate democracy . . . are not violated merely because [the plaintiffs] may have less time than they would like to have to present their views to fellow stockholders."[41]

---

[39] Appellate Decision at 954.

[40] *Id.* at 953–54 (internal citations and quotation marks omitted).

[41] 285 A.2d 430, 436 (Del. Ch. 1971), *rev'd*, 285 A.2d 437 (Del. 1971).

The Delaware Supreme Court reversed on appeal in a decision exceptionally modest in length. The greater part of the court's analysis is captured in the below two paragraphs:

> [M]anagement has attempted to utilize the corporate machinery and the Delaware Law for the purpose of perpetuating itself in office; and, to tht [sic] end, for the purpose of obstructing the legitimate efforts of dissident stockholders in the exercise of their rights to undertake a proxy contest against management. *These are inequitable purposes*, contrary to established principles of corporate democracy. . . .

> Management contends that it has complied strictly with the provisions of the new Delaware Corporation Law in changing the by-law date. The answer to that contention, of course, is that inequitable action does not become permissible simply because it is legally possible.[42]

These two paragraphs of *Schnell* have done a lot of work in Delaware jurisprudence. Most importantly, as noted in the Appellate Decision, this passage of *Schnell* reaffirmed Delaware's adherence to Adolf Berle's "twice tested" framework.[43] The Delaware Supreme Court articulated the essence of this general rule in a recent decision as follows: "Under Delaware law, director actions are 'twice-tested,' first for legal authorization, and second for equity."[44]

---

[42] 285 A.2d at 439 (emphasis added).

[43] *See* Adolf A. Berle, Jr., *Corporate Power as Powers in Trust*, 44 HARV. L. REV. 1049, 1049 (1931).

[44] *Bäcker v. Palisades Growth Cap. II, L.P.*, 246 A.3d 81, 96 (Del. 2021)) (cleaned up). Some have interpreted the twice-tested framework to mean that board action would be tested only twice—once for legal validity and once under the appropriate equitable standard. The Appellate Decision clarified that, at least in the unique circumstances of this case, board action may be tested "for equity" under multiple equitable standards and thus potentially tested thrice (or more).

*Schnell* has also been cited as a *standard* that may be employed by a court of equity to rectify inequitable conduct violating a clear right.[45] As a seminal decision securing the role of equity in corporate accountability, *Schnell* has been widely praised.[46] As a standard, *Schnell* has been widely criticized. As one commentator has observed, *Schnell* is insufferably vague in the sense that it supplies a judge with no real "boundaries or guideposts[] to invalidate otherwise legal conduct."[47]

*Schnell* has further been interpreted as creating a *per se* rule of illegality that directs an inflexible form of relief when its application is triggered. That is, if a purpose is deemed inequitable under *Schnell*, then it is *per se* illegal and void. In this case, as the Appellate Decision directs, if the board approved the Stock Sale for inequitable purposes under *Schnell*, then this court should "cancel" the Stock Sale.[48]

By making a board's purpose outcome-determinative, *Schnell* stands in contrast to modern, two-part equitable standards that evaluate both the subjective and objective

---

[45] *See* Appellate Decision at 962–63. The "clear right" language comes from *Ala. By-Prods. Corp. v. Neal*, 588 A.2d 255, 258 n.1 (Del. 1991).

[46] *See, e.g.*, Leo E. Strine, Jr. et al., *Loyalty's Core Demand: The Defining Role of Good Faith in Corporation Law*, 98 GEO. L.J. 629, 642 (2010).

[47] Mary Siegel, *The Illusion of Enhanced Review of Board Actions*, 15 U. PA. J. BUS. L. 599, 644 (2013) (footnote omitted) [hereinafter "*The Illusion*"].

[48] Appellate Decision at 953–54 & n.2.

aspects of a board's action.[49]  Compared to modern standards, *Schnell*'s vagueness and relative inflexibility render it an inferior tool for addressing fiduciary misconduct.[50]

The *Schnell* decision predated, by a decade, the Delaware Supreme Court's landmark decisions on intermediate standards of review.  Had *Schnell* been litigated after the creation of intermediate standards, the high court easily could have applied an intermediate standard, rather than an elliptical and seemingly *per se* rule.  The elusive nature of *Schnell* as a standard and the potentially harsh consequences of its application provide good reasons to limit *Schnell*'s application.  These aspects of *Schnell* have led the Delaware Supreme Court to instruct that *Schnell* be invoked sparingly.[51]

---

[49] *See, e.g.*, *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 955 (Del. 1985) (establishing a two part test that asks, first, whether the board acted in good faith to achieve a legitimate corporate objective, and second, whether the board's actions fell within the range of reasonableness); *Blasius* 564 A.2d at 658, 661–63 (establishing a two-part test that asks, first, whether the board acted "for the primary purpose of impeding the exercise of stockholder voting power," and second, whether the board establishes "a compelling justification for such action").

[50] Some have suggested that *Schnell*'s primary purpose is as a gap-filling standard applied to fact patterns beyond the reach of existing equitable standards.  *See, e.g.*, *Rosenbaum v. CytoDyn Inc.*, 2021 WL 4775140, at *14–15, *22 (Del. Ch. Oct. 13, 2021) (holding that the *Schnell* standard could theoretically apply to a challenge to a board's enforcement of an advance notice bylaw that does not trigger *Blasius* review, but concluding that the facts of the case left "no room for *Schnell*-inspired equitable principles to override the decision by the Board"); *but see* Mary Siegel, *Why Delaware Courts Should Abolish The* Schnell *Doctrine*, 5 AM. U. BUS. L. REV. 159, 186–87 (2016) (arguing that fiduciary duty jurisprudence makes *Schnell* unnecessary).  This decision's observations on the awkwardness of *Schnell* focus mainly on its application in factual scenarios where the court could just as easily employ a modern intermediate standard.

[51] *Ala. By-Prods.*, 588 A.2d at 258 n.1 ("While the doctrine of *Schnell v. Chris–Craft Industries, Inc.*, . . . is an important part of our jurisprudence, its application, or that of similar concepts, should be reserved for those instances that threaten the fabric of the law, or which by an improper manipulation of the law, would deprive a person of a clear right."); *see also Wyser-Pratte v. Smith*, 1997 WL 153806, at *2 (Del. Ch. Mar. 18, 1997) (same);

14

With these idiosyncrasies of *Schnell* and cautionary words atop of mind, this decision returns to the task of determining whether the UIP board approved the Stock Sale for "inequitable purposes."

As discussed above, *Schnell* provides little guidance as a standard. Although it prohibits board action taken for "inequitable purposes," it does not define the universe of "inequitable purposes."

Chancellor Allen's *Blasius* decision arguably informs the scope of *Schnell* where the challenged board action impedes the stockholder franchise. There, plaintiff Blasius Industries, Inc. ("Blasius") owned approximately 10% of Atlas Corporation ("Atlas") and proposed a leveraged recapitalization of Atlas. After the company issued a press release rejecting the proposal, Blasius delivered a form of stockholder consent that, if successful, would have increased the size of the board from seven to fifteen members and elected eight new directors nominated by Blasius. The Atlas board responded by adding two new members to the board, thereby depriving Blasius of the ability to elect a majority. Blasius sued under *Schnell* to enjoin the board's expansion.

The *Blasius* decision found that the Atlas board acted "in a good faith effort to protect its incumbency, not selfishly, but in order to thwart implementation of the

---

*In re WeWork Litig.*, 250 A.3d 976, 996 (Del. Ch. 2020) (providing that "'case law is indicative of a healthy inclination on the part of the judiciary to employ the Schnell principle of 'legal but inequitable' only sparingly,' and typically does so only when 'inequitable conduct has occurred but is not plainly remediable under conventional fiduciary doctrines'") (quoting 1 David A. Drexler et al., *Delaware Corporation Law and Practice* § 4.03, at 13 (2019))); *The Illusion* at 644 & n.189 (observing that "a capacious use of the *Schnell* doctrine could imperil the stability of Delaware law" (cleaned up)).

15

recapitalization that it feared, reasonably, would cause great injury to the Company."[52] Because the Atlas board acted in good faith, the Chancellor rejected the argument that the *per se* rule of *Schnell* applied.[53]  Although the court declined to deem the Atlas board's actions invalid *per se*, the Chancellor enjoined the board expansion because the board failed to demonstrate a compelling justification for its actions.[54]  The compelling-justification test employed in *Blasius* would later be elevated to a standard applicable when a board "acts for the primary purpose of impeding stockholders' franchise rights."[55]

In reasoning through Blasius' arguments, Chancellor Allen implicitly distinguished between disenfranchising actions that lack a good faith basis (and are thus *per se* prohibited under *Schnell*) and disenfranchising actions taken in good faith.  Indeed, it was this distinction that prompted the Chancellor to articulate the *Blasius* standard.[56]

Chancellor Allen would later clarify his intent that *Blasius* displace the *per se* rule of *Schnell*.  In his view, the possibility of a good faith basis for a disenfranchising action weighed in favor of supplanting the *per se* rule of *Schnell* with the more flexible two-step

---

[52] *Blasius*, 564 A.2d at 658.

[53] *Id.* at 662 (holding that "[i]n my view, our inability to foresee now all of the future settings in which a board might, in good faith, paternalistically seek to thwart a shareholder vote, counsels against the adoption of a per se rule invalidating, in equity, every board action taken for the sole or primary purpose of thwarting a shareholder vote, even though I recognize the transcending significance of the franchise to the claims to legitimacy of our scheme of corporate governance").

[54] *Id.* at 662–63.

[55] Appellate Decision at 962.

[56] *See Blasius*, 564 A.2d at 658.

approach of *Blasius*.[57]  Delaware law, however, did not clearly evolve in the direction urged

by Chancellor Allen.  At best, it is an open issue whether *Blasius* displaced *Schnell* as the

standard applicable when a board action impedes the stockholder franchise.  Perhaps there

is hope yet, and the difficulty that this jurist has had in distinguishing the two standards in

this context will inspire others to pick up where Chancellor Allen left off.[58]

In the meantime, one reading of the Appellate Decision is that *Schnell* establishes a

standard applicable to disenfranchising actions that is independent from *Blasius*.[59]  If the

standards are to have independent existence in this factual scenario, one must thus conclude

that they address distinct fact patterns; *Schnell*'s prohibited "inequitable purposes" must be

distinct from the facts that trigger *Blasius* review.  Viewed in this light, *Blasius* must be

interpreted as a carve-out to *Schnell* for disenfranchising actions taken in good faith.

Although viewing *Blasius* as a carve-out to *Schnell* gets the court closer to a working

definition of "inequitable purposes," the line between *Schnell* and *Blasius* is still

---

[57] *See Stahl v. Appel Bancorp, Inc.*, 579 A.2d 1115, 1122 (Del. Ch. 1990).

[58] Perhaps this movement will further inspire renewed interest in the project suggested by *Mercier v. Inter-Tel (Del.), Inc.*, where then-Vice Chancellor Strine urged that the *Blasius* and *Unocal* standards be brought "together in a workable manner."  929 A.2d 786, 809 (Del. Ch. 2007).  There, the Vice Chancellor lamented "the widely known reality that our law has struggled to define with certainty the standard of review this court should use to evaluate director action affecting the conduct of corporate elections."  *Id.* at 805.  Suffice to say, the struggle is real.  And the struggle is compounded by the possibility that *Schnell* might serve as an independent standard in this context.

[59] It may be that the high court viewed these standards as two faces of a unified standard; the Appellate Decision did refer to the analysis as "*Schnell/Blasius* review."  Appellate Decision at 963–64 & n.66.  Regardless of whether the high court intended that this court apply a unified *Schnell/Blasius* standard, rather than engage in separate inquiries under *Schnell* and *Blasius*, the outcome would be the same.

surprisingly difficult to draw.  Does *Schnell* apply to board actions lacking any good faith basis or all board actions having any bad faith motivation?[60]  Must the court look to the directors' subjective intent in making this determination?  Does the court presume bad faith where no business justification for the action can be credibly defended or otherwise discerned?[61]

In the end, no matter how one fashions a line between *Schnell* and *Blasius* under the carve-out approach, determining the scope of "inequitable purposes" prohibited by *Schnell* risks conflating the court's inquiry into purpose with the court's inquiry into justification. Chancellor Chandler might cringe at this step, or at least counsel against it.  In *Peerless*, Chancellor Chandler denied cross-motions for summary judgment on claims challenging the postponement of an annual stockholder meeting where a factual dispute concerning the board's justifications precluded judgment as a matter of law.  Before making factual

---

[60] In *Stahl*, Chancellor Allen argued against conflating "inequitable purpose" with motives or justifications, writing that "[a]n inequitable purpose is not necessarily synonymous with a dishonest motive. Fiduciaries who are subjectively operating selflessly might be pursuing a purpose that a court will rule is inequitable," as was the case in *Blasius*.  579 A.2d at 1121.  The converse is also true in certain circumstances.  Under entire fairness review, for example, fiduciary action undertaken for selfish reasons may nevertheless be deemed fair and thus equitable.  Chancellor Allen made this distinction, however, while arguing that *Blasius* should displace the *per se* rule of *Schnell*.  *Id.* at 1122.  If *Blasius* did not displace *Schnell* in the category of stockholder-franchise challenges, then this court is left to interpret "inequitable purpose" under *Schnell* as synonymous with improper motives.

[61] *See, e.g.*, Lawrence A. Hamermesh & Leo. E. Strine, Jr., *Voting Manipulation and Entrenchment*, *in* THE OXFORD HANDBOOK OF FIDUCIARY LAW 888, 888 (Evan J. Criddle et al. eds., 2019) (interpreting *Schnell* as ruling that "it was the *objective* circumstances themselves that established the requisite improper purpose" (emphasis in original)).

findings concerning the board's primary purpose and reviewing the disputed facts on the board's justifications, the Chancellor made a helpful theoretical distinction:

> inquiries into *purpose* as opposed to *justification* are two separate analyses that must remain distinct. The question of *purpose* asks for what ultimate ends were the acts committed. Purpose is defined as "[a]n objective, goal, or end." The concept of *justification* concerns the rationale behind the search for that end. *Justification* is defined as "[a] lawful or sufficient reason for one's acts or omissions."[62]

Chancellor Chandler's point is well-taken. And it continues to serve as an important distinction within the context of a *Blasius* review like that at issue in *Peerless*. But in a world where *Blasius* does not entirely displace *Schnell* as the standard applicable where a board purposefully disenfranchises stockholders, it seems inescapable that justifications inform the choice of a standard.

Heeding the policy determination that *Schnell* should be deployed sparingly, this decision interprets *Schnell*, when considered in the category of stockholder-franchise challenges, as applicable in the limited scenario wherein the directors have no good faith basis for approving the disenfranchising action. That factual finding can be made based on evidence that speaks directly to subjective intent. That factual finding also can made when objective evidence discredits proffered business reasons for the decision.

Interpreting "inequitable purposes" in this manner is consistent with decisions of this court that discredited business justifications for board actions as a predicate to invalidating them under *Schnell*. For example, in *Batzel*, *Phillips*, *Packer*, and *Lerman*,

---

[62] *Wis. Inv. Bd. v. Peerless Sys.*, 2000 WL 1805376, at *11 (Del. Ch. Dec. 4, 2000) (emphasis in original, citations omitted).

19

before invalidating the challenged board action under *Schnell*, this court made credibility determinations that the proffered business justifications for the challenged board actions were pretextual.[63] This interpretation is also consistent with the two pre-*Schnell* decisions invalidating stock issuances cited in the Appellate Decision, *Canada Southern Oils* and *Condec*. In each decision, the court took the same approach—rejecting business justifications as pretext before invalidating the stock issuance.[64]

---

[63] *See WNH Invs., LLC v. Batzel*, 1995 WL 262248, at *6 (Del. Ch. Apr. 28, 1995) (holding that a board's "justification for [a] stock issuance is pretextual" because the court could not "accept the contention that the timing and effect of the dilutive issuance was coincidental" and the "circumstances compel the conclusion that the purpose of the dilutive issuance was to defeat the challenge to the board's control"); *Phillips v. Insituform of N. Am., Inc.*, 1987 WL 16285, at *8 (Del. Ch. Aug. 27, 1987) (observing that "the record supplies scant grounds to suppose that an affirmative injury to the corporation was to be reasonably apprehended," and concluding that "the board acted . . . not to save the company from a threatened injury, but to change the capital structure of the firm so that it would be fairer to the owners of 86% of the company's equity and would make raising additional capital easier"); *Packer v. Yampol*, 1986 WL 4748, at *15 (Del. Ch. Apr. 18, 1986) (holding that "[e]ven if one accepts in its entirety the defendants' position that they had no economic choice but to issue the Preferred to Yampol, Battery, and Manor, no reason has been shown why, at the very least, the transaction could not have been made conditional upon the Preferred not being voted until after the May 13, 1986 election . . . . as a factual matter, defendants' claim that they had no other alternatives lacks adequate record support"); *Lerman v. Diagnostic Data, Inc.*, 421 A.2d 906, 912–14 (Del. Ch. 1980) (rejecting a board's argument that it adopted a bylaw amendment "not to thwart the intentions of the challengers" but to reduce election expenses by permitting time to come to "some accommodation between competing factions before the proxy materials are mailed" because the board acted "with full knowledge of [the stockholder's] intentions" to run a competing slate").

[64] *See Can. So. Oils, Ltd. v. Manabi Expl. Co., Inc.*, 96 A.2d 810, 812–13 (Del. Ch. 1953) (rejecting defendant's argument that it issued shares "to raise money to meet defendant's dire financial plight" because the court was "not persuaded that its long range financial prospects were as bad as defendant sought to represent them" and therefore the court "infer[red] that the primary purpose behind the sale of these shares was to deprive plaintiff of the majority voting control"); *Condec Corp. v. Lunkenheimer Co.*, 230 A.2d 769, 777 (Del. Ch. 1967) (holding that "[w]hile the record . . . is replete with accounting reasons in justification of Lunkenheimer's continuing fight against Condec's efforts to assimilate its

20

This interpretation is arguably consistent with language in the Appellate Decision, which repeatedly casts "inequitable purposes" as distinguishable from those taken in good faith,[65] and which uses words associated with subjective intent (e.g., "motives") when describing the *Schnell* analysis.[66]

In this case, the UIP board's decision did not totally lack a good faith basis. As discussed above, the UIP board had multiple reasons for approving the Stock Sale. Some were problematic. As the Appellate Decision explained, the UIP board's desire "to eliminate Plaintiff's ability to block stockholder action, including the election of directors, and the leverage that accompanied those rights" was inequitable.[67] The UIP board was also motivated to advance the best interests of UIP. As the Post-Trial Decision found, the UIP board sought to reward and retain an essential employee, to implement a succession

---

business by merger or otherwise," there was no "direct investigation, professional consultation or evidence of contradiction in the actions and explanations of corporate purpose on the part of Condec officials which would lead the management of Lunkenheimer justifiably to believe that Condec's aspirations represented a reasonable threat to the continued existence of Lunkenheimer").

[65] *See* Appellate Decision at 954 (framing the project of this court on remand as determining whether "the board acted for inequitable purposes *or* in good faith but for the primary purpose of disenfranchisement without a compelling justification" (emphasis added)); *id.* at 960 ("As explained below, the court should have considered Coster's alternative arguments that the board approved the Stock Sale for inequitable reasons, *or* in good faith but for the primary purpose of interfering with Coster's voting rights and leverage as an equal stockholder without a compelling reason to do so.").

[66] *Id.* at 958 (remanding for inquiry into "the board's *motives*" (emphasis added)); *id.* at 953 (remanding for consideration of "the board's *motivations* and purpose for the Stock Sale" (emphasis added)); *see also id.* at 963 (describing the *Schnell* inquiry as looking to "inequitable *reasons*" (emphasis added)).

[67] Post-Trial Decision at *12.

21

plan that Wout had favored, and to moot the Custodian Action to avoid risk of default under key contracts. The Post-Trial Decision held that under the entire fairness standard, the UIP board's mix of reasons and the substantive outcome it achieved were entirely fair. Those same findings establish that the UIP board did not act exclusively for an inequitable purpose.

Given the presence of good faith bases for approving the Stock Sale, the first question posed by the Appellate Decision can be answered in the negative: No, the UIP board did not approve the Stock Sale for inequitable purposes under *Schnell*. To the extent a *Schnell* rule exists that requires a court to declare invalid disenfranchising action taken for an inequitable purpose, that rule does not apply in this case.

**B.** *Blasius*

The analysis thus moves to the second question posed by the Appellate Decision: Did the UIP board approve the Stock Sale for the "'primary purpose of thwarting' Coster's vote to elect directors or reduce her leverage as an equal stockholder," and if so, did the UIP board have a "compelling justification" for doing so?[68]

As discussed above, the UIP board had many goals approving the Stock Sale: retaining and rewarding Bonnell, mooting the Custodian Action, and undermining Plaintiff's leverage. The Post-Trial Decision concluded, after weighing these purposes, that the Stock Sale was "significantly motivated by a desire to moot the Custodian Action,"

---

[68] Appellate Decision at 954.

and the Delaware Supreme Court emphasized that finding on appeal.[69]  Adhering to that finding as the law of the case, this decision finds that the Stock Sale was for the primary purpose of mooting the Custodian Action.

Importantly, in seeking to moot the Custodian Action, the UIP board sought to protect the Company.  They viewed the appointment of a custodian as deleterious to UIP and its stockholders, including Plaintiff.[70]

The UIP board's primary purpose was not to "'thwart[]' Coster's vote to elect directors."[71]  As a 50% stockholder, she did not have the power to elect directors.  Neither side did, which is why the stockholders were deadlocked.

The UIP board did seek to "reduce her leverage as an equal stockholder,"[72] in the sense that part of her leverage was the ability to pursue the Custodian Action.  That was not an inequitable purpose, in the sense of action contrary to the best interests of the Company.  Rather, it was an equitable purpose, in the sense of action that was in the best interests of the Company: the UIP board believed that the Custodian Action would cause

---

[69] Post-Trial Decision at *12.

[70] *Id.*  It bears emphasizing that mooting the Custodian Action was not the "singular impetus," as Plaintiff argues.  Pl.'s Post-Remand Opening Br. at 19 n.19.  Were that so, then Defendants could have issued Bonnell, Cox, or Schwat a single share.  Instead, Defendants undertook a process to establish a price and sold Bonnell the third of the Company's equity that he had long been promised.  While the timing suggests that the Company finally instituted this process and approved the sale as a consequence of the Custodian Action, the form of transaction corroborates the UIP directors' testimony that they were pursuing multiple goals at once, including a genuine desire to reward and retain Bonnell and implement the succession plan that Wout had favored.

[71] Appellate Decision at 954.

[72] *Id.*

23

defaults under the Company's key agreements and threaten the business. No one, including

Plaintiff, would benefit from that outcome.

This decision nevertheless assumes, as the Appellate Decision suggests, that a desire

to moot an action brought to appoint a custodian under Section 226(a)(1) of the DGCL due

to a deadlock between 50-50 stockholders is a purpose that triggers *Blasius*.[73] The question

then becomes whether the UIP board had a compelling justification for doing so.

Defendants bear the burden of demonstrating a compelling justification.[74] To

satisfy the compelling-justification standard, "the directors must show that their actions

were reasonable in relation to their legitimate objective, and did not preclude the

stockholders from exercising their right to vote or coerce them into voting a particular

way."[75] "In this context, the shift from 'reasonable' to 'compelling' requires that the

directors establish a closer fit between means and ends."[76] "If for some reason, the fit

between means and end is not reasonable, the directors would also come up short."[77]

The compelling-justification test has been described colorfully as calling for the

court to view the directors' explanations with a gimlet eye.[78] That is so for good reason.

---

[73] *See id.* at 963–64.

[74] *See Stroud v. Grace*, 606 A.2d 75, 91 (Del. 1992).

[75] *Mercier*, 929 A.2d at 810–11.

[76] *Pell v. Kill*, 135 A.3d 764, 787 (Del. Ch. 2016) (citation omitted).

[77] *Mercier*, 929 A.2d at 811.

[78] *See Pell*, 135 A.3d at 787 ("Although linguistically reminiscent of the type of review given to suspect classifications under the federal constitution, the use of the word 'compelling' is not intended to signal that type of strict scrutiny. Instead, it is a reminder for courts to approach directorial interventions that affect the stockholder franchise with a 'gimlet eye.'" (citations omitted)); *see also Williams v. Geier*, 671 A.2d 1368, 1376 (Del.

24

Delaware is rightly protective of the stockholder franchise because it is the "'ideological underpinning' upon which the legitimacy of the directors [sic] managerial power rests."[79] Consequently, to date this court has found compelling justifications under *Blasius* in limited circumstances.[80]

---

1996) (describing the compelling justification burden as "quite onerous" and "therefore applied rarely").

[79] *MM Cos., Inc. v. Liquid Audio, Inc.*, 813 A.2d 1118, 1126 (Del. 2003) (quoting *Blasius*, 564 A.2d at 659); *see, e.g.*, *EMAK Worldwide, Inc. v. Kurz*, 50 A.3d 429, 433 (Del. 2012) ("Shareholder voting rights are sacrosanct. The fundamental governance right possessed by shareholders is the ability to vote for the directors the shareholder wants to oversee the firm. Without that right, a shareholder would more closely resemble a creditor than an owner." (footnote omitted)); *Paramount Commc'ns, Inc. v. QVC Network, Inc.*, 637 A.2d 34, 42 (Del. 1994) ("Because of the overriding importance of voting rights, this Court and the Court of Chancery have consistently acted to protect stockholders from unwarranted interference with such rights."); *San Antonio Fire & Police Pension Fund v. Bradbury*, 2010 WL 4273171, at *7 (Del. Ch. Oct. 28, 2010) ("Stockholders exercise their authority over corporate affairs by way of ballots. Accordingly, the right to vote on certain matters— most importantly the election of directors—is a fundamental power reserved to the stockholders." (footnote omitted)).

[80] *See, e.g.*, *Mercier*, 929 A.2d at 819 (explaining that "[i]n the corporate context, compelling circumstances are presented when independent directors believe that: (1) stockholders are about to reject a third-party merger proposal that the independent directors believe is in their best interests; (2) information useful to the stockholders' decision-making process has not been considered adequately or not yet been publicly disclosed; and (3) if the stockholders vote no, the acquiror will walk away without making a higher bid and that the opportunity to receive the bid will be irretrievably lost"); *Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022, 1089 (Del. Ch. 2004) (holding that "even if *Blasius* did apply to the Rights Plan, a sufficiently compelling justification exists for any incidental burden on Inc.'s voting rights. Inc. is not blameless here; it is charged with knowledge of the misconduct of its agent, Black. The time-limited use of a Rights Plan is permissible in these extraordinary circumstances"); *see also Peerless*, 2000 WL 1805376, at *15 (on a motion for summary judgment, leaving open the possibility, but expressing doubt, that the defendants could satisfy the compelling-justification test through their collective proffered justifications, none of which were individually sufficient to satisfy the compelling-justification test); *The Illusion* at 643 (observing that, as of 2013, "only five cases, four by the Delaware Court of Chancery and one by the Delaware Supreme Court, have triggered the Blasius test, and, at best, only one passed" (footnotes omitted)).

25

In the exceptionally unique circumstances of this case, Defendants have met the onerous burden of demonstrating a compelling justification. Defendants proved that the broad relief sought by Plaintiff in the Custodian Action rose to the level of an existential crisis for UIP. Defendants demonstrated that the appointment of a custodian could trigger broad termination provisions in key contracts and threaten a substantial portion of UIP's revenue. Defendants also proved, more generally, that UIP was a services business dependent on personal relationships; thus, displacing oversight and managerial powers would defeat the founders' purpose in forming UIP.[81]

---

[81] In the Post-Trial Decision, the court held that "Plaintiff does not dispute the existence of broad termination rights and clauses identifying the appointment of a custodian as a default." Post-Trial Decision at *12 n.190. In post-remand briefing, Plaintiff takes issue with this finding, arguing that "in both her Opening Post-Trial Brief at pages 54-56, and in her Post-Trial Answering Brief at pages 37-42, Plaintiff vigorously disputed that contention." Pl.'s Post-Remand Opening Br. at 27 n.29. But in those pages, Plaintiff did not initially dispute *the existence of* broad termination rights. Rather, Plaintiff first argued that Defendants failed to prove that investors would exercise these rights. *See* Dkt. 143 (Pl.'s Post-Trial Opening Br.) at 54–55 (arguing that "Defendants failed to present any evidence from any counterparty to a UIP contract (or a contract of UIP GC or UIP PMC) that appointment of a custodian would lead that counterpart to terminate an agreement with UIP or its subsidiaries"). Perhaps recognizing the weakness of this argument, Plaintiff added arguments in her next brief, including that (i) UIP is not a party to the contract excerpts in evidence, which are between SPEs and either UIP Property Management, Inc. or UIP Asset Management, Inc.; (ii) while some of the excerpted contracts provide for termination without cause, some are only terminable for cause; and (iii) many of the contracts refer to bankruptcy, dissolution, or some other liquidation as an event of default, but do not explicitly mention "custodian appointment." *See* Dkt. 149 (Pl.'s Post-Trial Answering Br.) at 37–42. Thus, according to Plaintiff, appointment of a custodian over UIP "would constitute default in only one or two of the 43 agreements submitted by Defendants as evidence in this action." *Id.* at 39. The court rejected these arguments previously. Having again reviewed these arguments and the contract excerpts in evidence, the court remains convinced that appointment of a custodian would constitute a terminable event under many of the Company's agreements. *See, e.g.*, JX-79 at 6910 (authorizing termination without cause), 6914 (authorizing termination for no cause), 6917 (authorizing termination for no cause), 6931 (authorizing termination if the "UIP Key Principals" cease

Defendants also proved that the Stock Sale was appropriately tailored to achieve the goal of mooting the Custodian Action while also achieving other important goals, such as implementing the succession plan that Wout favored and rewarding Bonnell. Although it is true that the Stock Sale eliminated Plaintiff's ability to use her 50% interest to block stockholder action, the Stock Sale also had that effect on Schwat. The transaction made Bonnell the swing vote and deprived both incumbent 50% owners of their blocking rights. Although Schwat and Bonnell currently have a good working relationship, and although the Post-Trial Decision held that they worked together to consummate the Stock Sale, that transaction did not impose any future obligations on Schwat and Bonnell to vote as a block. Bonnell could switch sides tomorrow and unite with Plaintiff to Schwat's detriment. The record reflects that Schwat and Bonnell have disagreed on a number of business decisions.[82] To make Bonnell the swing vote, Schwat clearly believed that the Custodian Action was a threat to the Company and that Bonnell was vital to the Company. Because

---

"to Control" or "be primarily responsible for the day-to-day operations of" a UIP affiliate), 6939 (authorizing termination for no cause), 6947 (authorizing termination for no cause), 6954 (authorizing termination if one of the UIP Principals, defined as Schwat, Bonnell, and Heath Wilkinson, ceases "to control the ownership and management of UIP Member"). These provisions, in addition to the credible testimony of Defendants' witnesses, support the court's finding that many of the Company's agreements are terminable in the event a custodian is appointed over the Company. *See* Trial Tr. at 357:23–358:1 (Schwat) (testifying that "the appointment of a custodian is a default under the majority of JV agreements we have with our partners"), 456:15–17 (Bonnell) (testifying that "many of the operating agreements are specific that the appointment of a custodian is a default").

[82] *See* Trial Tr. at 361:1–19 (Schwat testifying that Bonnell operates as a "check" on him, that they disagree, and that Bonnell does not defer to him), 423:4–425:23 (Bonnell testifying about his working relationship with Schwat and discussing a recent disagreement).

the Stock Sale created the possibility of a swing vote, it is difficult to view it as coercive or preclusive in the context of director elections.

The UIP board could have chosen more aggressive means of breaking the deadlock that would have favored Schwat. They could have issued him an additional share, thereby giving him hard voting control. They could have issued Schwat options, claiming that it was part of his compensation. They could have created an employee stock option plan and empowered Schwat to vote those shares. The list of potential transactions is limited only by the creativity of transaction planners. But the UIP board did not pursue a course that would enhance Schwat's authority. It implemented the succession plan that Wout had favored.

These are the reasons that the Post-Trial Decision stated, albeit in an inartful and cursory manner, that "Plaintiff did not succeed in proving her theories regarding Defendants' purposes or justifications."[83] The evidence showed that the UIP board had a compelling justification for acting, although one that the court considered as part of its review under the entire fairness test rather than as part of a separate *Blasius* analysis.

Ignoring this part of the Post-Trial Decision, Plaintiff takes the position on remand that the court's prior factual findings preclude any finding that Defendants had a compelling justification for approving the Stock Sale. In Plaintiff's view, the court's only option on remand is to cancel the Stock Sale—a sale that was found to be entirely fair—

---

[83] Post-Trial Decision at *13. The court recognizes that Defendants bear the burden of proving justifications and the court has allocated the burden appropriately for the purpose of this analysis.

28

and appoint a custodian. Of course, granting Plaintiff's requested relief would expose UIP to the business risks that Defendants sought to avoid, including jeopardizing key SPE contracts and chancing Bonnell's departure. To Plaintiff, those risks are of no moment and worthy of no consideration. In Plaintiff's view, the court must grant this potentially destructive relief.

Plaintiff's argument is misguided for several reasons. For starters, Plaintiff's position would mean that the Delaware Supreme Court did not mean what it said, and that although the high court stated this court was free to conduct further analysis, it really meant for this court to invalidate the Stock Sale.[84] This court has an obligation to follow the rulings of the Delaware Supreme Court, including a ruling stating that this court has the freedom to exercise its best judgment on remand. If the only possible outcome in this case was for the Stock Sale to be invalidated, the Supreme Court could have held as much.

Plaintiff's legal authorities are distinguishable. Plaintiff cites to *Liquid Audio* as its primary authority for the premise that where a board acts for the "primary purpose" of maintaining its control, there can be no compelling justification, and the board action must *prima facie* fail under *Blasius*.[85] But in *Liquid Audio*, the Delaware Supreme Court held that no compelling justification existed because, as conceded by the board in that case, the

---

[84] *Compare Liquid Audio*, 813 A.2d at 1132, *with* Appellate Decision at 964.

[85] *See* Pl.'s Post-Remand Opening Br. at 15–17 n.9–15 (citing *Liquid Audio*, 813 A.2d at 1132 and collecting cases).

justification for their action was solely the threat that the stockholders would choose different directors.[86]

If there is one aspect of the compelling-justification standard that cases have made clear, it is that "the belief that directors know better than stockholders is not a legitimate justification when the question involves who should serve on the board of a Delaware corporation."[87] "The notion that directors know better than the stockholders about who should be on the board is no justification at all."[88] "[E]ven a board's honest belief that its incumbency protects and advances the best interests of the stockholders is not a compelling justification. Instead, such action typically amounts to an unintentional violation of the fiduciary duty of loyalty."[89]

In this case, the UIP board did not act for the primary purpose of protecting its incumbency. Rather, the UIP board had significant business reasons for approving the Stock Sale, which the Post-Trial Decision credited. Those reasons provide a compelling justification for the UIP board's action.[90]

---

[86] *See Liquid Audio*, 813 A.2d at 1125 (quoting interrogatory response provided by board members).

[87] *Pell*, 135 A.3d at 790.

[88] *Mercier*, 929 A.2d at 811; *see also Blasius*, 564 A.2d at 663.

[89] *Esopus Creek Value LP v. Hauf*, 913 A.2d 593, 602 (Del. Ch. 2006) (footnotes omitted).

[90] Plaintiff also cites to *Benihana* and *Keyser*, but neither support Plaintiff's position. In *Benihana*, this court declined to hold that directors acted improperly when taking action that diluted the interest of a dissident shareholder who expressed the desire to control the company and was viewed as "hostile" to management. *See Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 193 (Del. Ch. 2005); *see also* Pl.'s Post-Remand Opening Br. at 16 n.14 (citing same). Likewise, the facts in *Keyser* are distinguishable. In that case, the sole director executed a written consent creating 50,000 shares of new voting stock that

Because this decision finds that the UIP board had a compelling justification for the Stock Sale, the court declines to cancel the Stock Sale. Accordingly, there is no need to appoint a custodian or fashion alternative relief.

## III.  CONCLUSION

Many aspects of the facts and law of this case were vexingly complicated or unique. This court has done its best to discern the appropriate standard and apply it faithfully. Nevertheless, the case gave rise to many close calls on which reasonable minds could differ. In the end, the court takes solace in knowing that the ultimate solution to the deadlock—the Stock Sale—was consistent with the succession plan that Wout and Schwat devised on a clear day before deadlock emerged. The only aspects of the sale left unaddressed at the time of Wout's death were the substantive terms. The UIP board achieved terms that the Post-Trial Decision found to be entirely fair. For all of the foregoing reasons, judgment is again entered in favor of Defendants.

---

entitled the exercise of 1,000 times more voting power than the previously issued common stock, and then issued 25,000 shares of this stock to himself for "a penny a share." *See Keyser v. Curtis*, 2012 WL 3115453, at *4, *12–13 (Del. Ch. July 31, 2012), *aff'd*, 65 A.3d 617 (Del. 2013) (TABLE). These actions are distinguishable from Defendants' actions, where the Stock Sale was made after an entirely fair valuation of the Company, to an individual who had long been promised equity, with the goal of avoiding the harm posed to the Company by a custodian with the broad powers requested by Plaintiff.